# EXHIBIT 5



Michael S. Truesdale
Direct: 512.615.1232
Cell: 512.507.3812
mtruesdale@enochkever.com

September 14, 2022

Honorable Jeffrey J. Helmick
Judge, United States District Court
Northern District of Ohio
James M. Ashley and Thomas W.L. Ashley U.S. Courthouse
1716 Spielbusch Avenue, Room 210
Toledo, OH 43604-1363

> RE:  Case No. 1:13-dp-20140. Andrea K. Drake, et al. v. Depuy Orthopaedics Inc.
> Case No. 1:17-dp-20085, Steven M. Johnson v. William Scott Drake

Judge Helmick:

Movant, Steven M. Johnson d/b/a The Johnson Law Firm ("Johnson"), submits this letter requesting a ruling on its September 9, 2021 Motion to Confirm Arbitration Award (Doc. 51, 9/9/2021).

This arbitrated fee dispute between Johnson and Drake has been toggling between federal district and appellate courts for almost six years now, ever since the completion of an arbitration by Judge Ashworth in Texas in 2016. Initially, this Court refused to confirm, and in fact vacated the arbitration award, and the Sixth Circuit reversed this Court on the ground that its ruling was not final and appealable. On remand, this Court again entered an order denying confirmation and vacating the arbitration award, and again, the Sixth Circuit reversed this Court.

On subsequent remand, Johnson moved for the entry of an order confirming the arbitration award, Doc. 51, and Drake separately moved to vacate the award, Doc. 53. Johnson's motion has been pending before this Court for one year now.

The parties are entitled to a resolution of this matter. One of the proclaimed purposes justifying the preferred treatment of arbitration agreements among parties is that they allow for the speedy and cost-effective resolution of disputes without the attendant delays and costs associated with litigation and the multiple levels of appeal that may otherwise arise if a matter were litigated in the ordinary course.

Honorable Jeffrey J. Helmick
September 14, 2022
Page 2

Here, the absence of the entry of an order is frustrating the benefits of arbitration as they inure to both parties. This dispute is now eight-years old and was fully arbitrated over six years ago. The parties are entitled to an answer to the question whether the arbitration order shall be confirmed or vacated so they may go forward.

Accordingly, Steven M. Johnson d/b/a The Johnson Law Firm respectfully request that this Court issue an order on the competing motions to confirm or vacate the July 7, 2016 arbitration award so that the parties may take appropriate steps to bring this dispute to its ultimate conclusion.

Respectfully submitted,

*/s/ Michael S. Truesdale*
Michael S. Truesdale – LEAD COUNSEL
mtruesdale@enochkever.com
Marla D. Broaddus
mbroaddus@enochkever.com
ENOCH KEVER, PLLC
7600 N. Capital of Texas Hwy
Bldg. B, Suite 200
Austin, Texas 78731
Telephone: (512) 615-1200
Telecopier: (512) 615-1198

*Attorneys for Interested Party/Petitioner, Steven M. Johnson*

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record are being served with a copy of the foregoing document via the Court's CM/ECF system per Local Civil Rule 5.1 on September 14, 2022.

*/s/ Michael S. Truesdale*
Michael S. Truesdale



## ATTORNEY REPRESENTATION AGREEMENT - DEPUY ASR HIP DEVICE

1. CLIENT(S), hereby retain(s) Steven M. Johnson, P.C d/b/a The Johnson Law Firm (JLF) , (hereinafter "attorneys" or "Firm") as attorneys to bring all claims Client may have against the manufacturer and distributor of the DEPUY ASR HIP DEVICE that caused Client's injuries, hereafter referred to as the "claim."

2. Client understands and agrees that The Firm has not been retained to investigate or pursue, and will not investigate or pursue, any medical malpractice action against client's doctors or any healthcare provider or facility.

3. For services rendered and to be rendered in this matter client agrees to pay the attorneys a fee, CONTINGENT ON WHAT IS RECOVERED in this matter by way of settlement, judgment or otherwise, to be computed as FORTY PERCENT (40%) of all sums recovered.

4. After the above fees are deducted, client shall pay to attorneys, ONLY OUT OF THE CLIENT'S SHARE OF THE RECOVERY AND NOT OUT OF CLIENT'S POCKET, all court costs and expenses, advanced by the attorneys in connection with said matter. Costs shall include any "MDL Assessment or Fee", "common benefit fee" or any other fee or cost imposed by any court or withheld from any settlement or judgment. The attorneys are authorized to incur those expenses they deem reasonable and necessary to accomplish a satisfactory resolution of the claim and shall advance those expenses as incurred. The cost of these services not to exceed the customary and reasonable charges for such services in the geographic location they are provided. CLIENT WILL NOT OWE THE FIRM EITHER A FEE, REIMBURSEMENT OF EXPENSES, OR ANY OUT OF POCKET AMOUNTS IF AT THE FINAL DISPOSITION OF THE CASE NOTHING IS RECOVERED ON BEHALF OF THE CLIENT.

5. Attorneys, their agents and employees, shall take all steps deemed by them to be necessary, reasonable and appropriate to properly prosecute the claim.

6. THE CLIENT HEREBY GRANTS THE ATTORNEYS A LIEN ON THIS CAUSE OF ACTION, and a lien on any proceeds and any judgments recovered in connection with this cause of action as security for the payment of attorneys' fees and expenses as contracted for herein. Attorneys may assign their interest.

7. THE CLIENT AGREES THAT THE ATTORNEYS RETAIN THE RIGHT AT ANY TIME FOLLOWING INVESTIGATION, DISCOVERY, OR LEGAL RESEARCH, TO RELEASE THEMSELVES FROM THIS CONTRACT AND WITHDRAW FROM THE REPRESENTATION OF THE CLIENT. THE ATTORNEYS WILL RETAIN A LIEN ON THE CASE FOR EXPENSES AND COSTS IN THE EVENT OF SUCH A WITHDRAWAL, WHICH HAVE BEEN ADVANCED ON THE CLIENT'S BEHALF. THE CLIENT AGREES TO PROTECT SUCH SUMS OUT OF ANY RECOVERY ULTIMATELY OBTAINED IN THE CASE.

8. This contract is entered into in Tarrant County, Texas, which shall also be the place of performance and payment in accordance with the terms of the contract. Furthermore, this contract contains all the agreements of the parties. This agreement shall be construed in accordance with the laws of the State of Texas, and all obligations of the parties are performable in Tarrant County, Texas. In case any one or more of the provisions contained in this agreement shall be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision, and this agreement shall be construed as if such invalid, illegal, or unenforceable provision did not exist. This agreement constitutes the only agreement of the parties and supersedes any prior understandings or written or oral agreements between the parties respecting the subject matter.

9. CLIENT hereby gives ATTORNEY power of attorney to execute all documents, in CLIENT'S name, associated with any litigation which may arise out of the incident in question, including, but not limited to, authorizations for the release of protected records, interrogatory answers, affidavits, trust documents, and/or other litigation-related documentation.

10. Before signing this fee contract, I acknowledge that I have read it completely and understand it, or that it has been read and explained to me, and that all blanks have been completed and that I have received a copy.

11. This contract is binding on the clients' heirs, executors, administrators and guardians of the person or estate.

12. The client acknowledges that the attorneys have made NO GUARANTEE regarding the successful resolution of said cause of action, and all expressions relative thereto are matters of attorneys opinion only and shall not be considered as express or implied warranties of the claim's outcome.

13. Attorneys have advised Client of the advantages and disadvantages of the use of arbitration to resolve any disputes arising from the interpretation, performance, or breach of this Fee Agreement. Client acknowledges that the Client understands that agreement to arbitration means that Client gives up or waives the right to a jury trial, which may affect the amount of damages, if any, ultimately awarded to the Client, and that the Client's right to discovery will be more limited than in a trial proceeding. It is, nevertheless, Client's desire that this Fee Agreement provide for binding arbitration of any disputes between client and the Firm. ***[CLIENT INITIAL HERE _WSJ_ X

14. Attorneys and Client agree that any dispute arising from the interpretation, performance, or breach of this Fee Agreement including any claim of legal malpractice, but not including attorney disciplinary proceedings, shall be resolved by final and binding arbitration conducted in Fort Worth, by any other arbitrator that The Firm may choose. Attorneys and Client further agree that judgment upon any award rendered by the arbitrator in such proceedings may be entered by any state or federal court with jurisdiction over the matter. ***[CLIENT INITIAL HERE _WSJ_ X

15. Client acknowledges that Attorneys have specifically advised Client of the advantages and disadvantages of the use of arbitration to resolve disputes arising from the interpretation, performance, or breach of this Fee Agreement and given Client the opportunity to seek the advice of independent counsel concerning this provision and Client has either done so or expressly declines to do so. ***[CLIENT INITIAL HERE _WSJ_ X

16. I hereby swear and affirm that I voluntarily and of my own free will and choice, without any solicitation whatsoever, by The Firm or anyone else, including any referring attorney, employed The Firm, without any promise of any remuneration or special favor, as my attorneys to compromise, settle, try or receive for and in my name all damages arising to me out of the above styled case.

17. I AM NOT REPRESENTED BY ANY OTHER LAW FIRM OR ATTORNEY ON THIS CLAIM.


CLIENT _____ DATE 1/24/12

STEVEN M. JOHNSON, THE JOHNSON LAW FIRM _____ DATE 1/30/12

SMJ1 036

EXHIBIT A-2

# JAMS ARBITRATION

| | | |
|---|---|---|
| STEVEN M. JOHNSON, | §<br>§<br>§ | |
| Claimant, | §<br>§ | REFERENCE No. 1310021509 |
| v. | §<br>§ | |
| WILLIAM DRAKE, | §<br>§<br>§ | |
| Respondent. | § | |

## CORRECTED FINAL AWARD

**Parties and Counsel**: The parties are identified in the caption and represented as follows:

Barry Johnson
Thomas R. Needham
3116 W. Fifth St.
Suite 107
Fort Worth, TX 76107
Phone: 817-523-1330; Fax: 469-248-0602
Email: johnsonneedhamlaw@gmail.com
Counsel for *Claimant*

Jennifer Morris Andrews
2501 Parkview Dr.
Suite 303
Fort Worth, TX 76102
Phone: 817-338-1707; Fax: 817-338-1787
Email: j.andrews@wallach-law.com
Co-Counsel for *Claimant*

Anthony Nemo
Ashleigh E. Raso
Andrew L. Davick
1616 Park Avenue
Minneapolis, MN 55404
Phone: 612-339-9121; Fax: 612-339-9188
Email: tnemo@meshbesher.com; araso@meshbesher.com;
  adavick@meshbesher.com
Counsel for *Respondent*

EXHIBIT
4

Karin Cagle
1619 Pennsylvania Ave.
Fort Worth, TX 76104
Phone: 817-721-5127; Fax: 817-335-7735
Email:  kcaglelaw@gmail.com
Co-Counsel for *Respondent*

**Arbitrator**:                 Hon. Glen M. Ashworth
JAMS – The Resolution Experts
8401 N. Central Expressway, Suite 610
Dallas, Texas 75225
Phone: 214-744-5267; Fax: 214-720-6010

**Case Manager:**          Carolina El'Azar
JAMS – The Resolution Experts
8401 N. Central Expressway, Suite 610
Dallas, Texas 75225
Email:  celazar@jamsadr.com
Phone: 214-891-4520; Fax: 214-720-6010

Pursuant to the arbitration provisions contained in paragraphs 13-15 of their Attorney Representation Agreement – DePuy ASR Hip Device ("ARA"), signed by Respondent, William Drake ("Drake"), on January 24, 2012, and Claimant, Steven M. Johnson ("Johnson" and also referred to as the Johnson Law Firm or "JLF") on January 30, 2012, the parties have submitted to binding arbitration before Hon. Glen M. Ashworth, serving as their sole Arbitrator.   The arbitration was convened in Dallas, Texas, beginning April 4, 2016.  The parties proceeded to present their offers of proof, including statements of counsel, testimony of fact and expert witnesses, depositions and documentary evidence.   Thereafter, the parties submitted post-arbitration briefing for consideration.

The Arbitrator has determined that all matters in controversy submitted to this tribunal are arbitrable and that proper jurisdiction exists.  All issues have been determined by the evidence presented during the full arbitration. The standard of proof is based on a preponderance of the evidence, unless otherwise stated.

## CLAIMANT'S MOTION TO CORRECT

The Final Award in this matter (JAMS Ref. No. 1310021509) was signed and service perfected on June 22, 2016. On June 28, 2016, the Claimant filed "Claimant Steven M. Johnson's Motion to Correct Final Award Pursuant to JAMS Rules 24 (d) and (j)." Claimant's Motion seeks to amend the Final Award to include additional procedural findings and to correct a typographical error.

The JAMS rules, and specifically Rule 24, neither provide for nor allow post-award modifications or amendments. Accordingly, the Arbitrator declines to address this request.

The Arbitrator does find, however, that a typographical error does exist in the Final Award, page 14, last sentence of first paragraph of Section G: "Attorneys' Fees" in the following respect: the term "ADA" should be properly corrected to "ARA".

Pursuant to JAMS Rule 24 (j), Claimant has timely requested this typographical correction and Respondent has raised no timely objection to this change. This requested correction is therefore GRANTED and is changed in the body of the Corrected Final Award.

## PROCEDURAL HISTORY

This arbitration arises from an attorney fee collection suit brought by Steven Johnson, whose primary law office is located in Ft. Worth, Texas, against his former client, William Drake, a resident of Minnesota. Pursuant to their Attorney Representation Agreement, Drake agreed to pay a contingent fee of 40% of amounts recovered from Drake's DePuy hip replacement device claims. Johnson's representation was subsequently terminated by Drake.

Following a settlement of Mr. Drake's claims, Johnson seeks payment of his contingency fee.

On July 31, 2014, Johnson initiated this arbitration with the Dallas office of JAMS, Ref. No. 1310021501, and served a Demand on Drake (the "Dallas JAMS arbitration"). The following day, Johnson filed an Original Complaint to Compel Arbitration in the Northern District of Texas, Ft. Worth Division, Cause No. 4:14-CV-611 (the "Ft. Worth suit"). The Ft. Worth suit was subsequently dismissed by the Judge, Hon. John McBryde, for lack of *in personam* jurisdiction in a Memorandum Opinion and Order dated November 25, 2014.

On August 15, 2014, Drake entered an appearance in the Dallas JAMS arbitration by filing a Response to Arbitration Demand and Statement of Affirmative Defenses. Respondent also challenged jurisdiction based on the lack of *in personam* jurisdiction finding and dismissal of the Ft. Worth suit. The arbitration was formally commenced on August 27, 2014. Following commencement, the parties jointly participated in the arbitrator selection process and selected Hon. Glen M. Ashworth as their sole arbitrator.

Pursuant to an Interim Order, dated January 20, 2015, the Arbitrator found jurisdiction to arbitrate existed and that the issues were arbitrable. The Arbitrator thereafter established discovery deadlines contained in Scheduling Order No. 1, dated January 30, 2015. Following a request for rehearing and citing waiver through Respondent's full participation in the arbitration process, jurisdiction was confirmed in an Interim Order, dated February 23, 2015. In accordance with the Scheduling Order, the parties jointly engaged in the established discovery and pre-arbitration preparation.

By agreement of the parties and for purposes of settlement discussions, the original hearing date of July 16-17, 2015, was continued. Thereafter, by Scheduling Order No. 2, dated November 23, 2015, the matter was set for hearing on April 4, 2016.

In early 2016, Drake sought to invoke the MDL arbitration process and Special Master Yanni issued her Scheduling Order No. 1 in JAMS Ref. No. 1200048059 on February 16, 2016 ("JAMS MDL arbitration"). In response, Johnson filed a Petition to Compel Arbitration in the Northern District of Texas, Dallas Division, Cause No. 3:16-CV-0094-D on February 22, 2016 (the "Dallas suit"). On March 9, 2016, Special Master Yanni issued Order No. 2: Jurisdiction, in the JAMS MDL arbitration, and concluded she did not have jurisdiction over the matter and withdrew her Scheduling Order No. 1. Accordingly, Johnson filed a Notice of Voluntary Nonsuit in the Dallas suit on March 11, 2016.

The arbitration hearing was then begun on April 4, 2016, in Dallas, Texas.

## BACKGROUND

Claimant, Steven M. Johnson, is an attorney whose principal office is located in Ft. Worth, Texas. For the last 20 years, his practice has been primarily devoted to the areas of mass tort and Multi District litigation ("MDL"). Having done extensive research and investigation into the defects regarding the DePuy ASR hip replacement device ("DePuy hip device" or "device"), he began to promote his legal services for the prosecution of those related cases. In soliciting for those claims, he utilized the national newspaper media, as well as websites and seminars. He did not use a television campaign.

Respondent, William Drake, is a resident of Minnesota. He is a college graduate and successful businessman. On April 19 and May 31, 2007, Drake was implanted with left and right DePuy hip devices. Although not experiencing medical issues with the devices at the time, someone on his behalf contacted Johnson's office by phone on September 27, 2010, and

requested information regarding representation. Between September 28, 2010 and January 19, 2012, JLF contacted Drake through calls and letters 57 times. According to the JLF call notes, most of the calls resulted in voice messages. Several calls, however, were received directly by Drake or his wife, Andrea Drake, including an October 18, 2010 call between Drake and Johnson. Additionally during this time, JLF also provided Drake with an information packet, a proposed Attorney Representation Agreement and medical authorization, medical and legal updates and articles, a list of frequently asked questions and an informative video. While Respondent and his wife expressed interest in Johnson's representation, Drake testified that he did not read any of the material. Following 6 months of no direct contact from Drake, Johnson sent him a final letter on January 19, 2012, which stated that "Failing to contact us may result in the closing of your file and the loss of your rights."

On January 24, 2012, without ever personally meeting Johnson and according to Drake, without reading the documents, Respondent signed and initialed the ARA and medical authorization. Johnson signed the contract on January 30, 2012. On March 9, 2012, Johnson forwarded Drake a letter which accepted the representation and included instructions regarding the updating of his medical condition and revision surgeries. The letter also contained phone numbers to reach Johnson and his staff for any questions related to his case. Subsequently, Johnson put the DePuy manufacturer on notice of Drake's claims on March 12, 2012, and thereafter obtained his medical records.

Following notification to DePuy and obtaining Drake's medical records, there was limited attorney/client communication between April through October, 2012. Essentially, the next phase of the case was subject to the timing of the revision surgeries. Although Drake claims he and his wife made several phone calls to JLF requesting updates, the call notes do not reflect

such inquiries. Significantly, the call notes do reflect and Mrs. Drake acknowledged that she called JLF on November 28, 2012. During this call, she advised that "Drake was having revision surgery on December 17, but would not give further information because she wasn't sure if they would leave the case with JLF or move it to a friend, who was an attorney."

On November 29, 2012, Respondent signed a Substitution of Attorneys document hiring Charles H. Johnson, a Minnesota attorney, to represent him in his DePuy claims. The following day, Charles Johnson forwarded a letter to Steven Johnson advising him of the substitution and enclosed a copy of the document. In his letter, Charles Johnson explained the basis for the termination and substitution was due to his "ongoing professional relationship with Mr. Drake's family" and that "they wanted a local attorney who they could actually meet with in person." In that letter, he additionally requested a copy of the file from JLF. Finally, on December 5, 2012, Drake called JLF and spoke to an assistant, Rudy Villareal. The conversation was reflected in the call notes and Drake advised that "Chuck Johnson who is local and a big hitter would be taking over the case." Although Drake was reminded of the ARA, he nonetheless indicated Charles Johnson was going to handle the case and "is going to work something out with Steven Johnson." Drake had his left hip revision on December 17, 2012.

On January 10, 2013, Charles Johnson again requested the file and it was subsequently forwarded to him on January 17, 2013. In the interim, Drake terminated his attorney/client relationship with Charles Johnson on January 14, 2013, and hired the Minnesota law firm of Meshbesher & Spence, Ltd. ("Meshbesher"). JLF put Meshbesher, through its partner, Tony Nemo, on notice of his attorney contract lien of 40% of the full recovery, plus expenses, on March 24, 2013. Subsequently, on June 30, 2014, Nemo responded to Johnson and disputed his claim and denied his entitlement to "any portion of the settlement.

After Johnson's termination, Drake received both his left and right hip revisions and Meshbesher settled all of his claims in the MDL. The parties have stipulated that his recovery of all Settlement Awards, as of the date of this arbitration, was $561,750, per the Settlement Program schedule that was admitted, without objection. In addition, there remains an outstanding claim for discretionary loss of earnings award (EIF Claim No. 3585) which has not yet been determined.

The preceding background statement is found by the Arbitrator to be true and necessary to the Award. To the extent that this recitation differs from a party's position, that is the result of determinations as to credibility, relevance, burden of proof and weight of the evidence, both oral and written.

Claimant seeks recovery of his 40% (35% net) contingency fee and expenses from Drake's awards. Respondent denies his claim based on an invalidity of the ARA; fraudulent inducement; "good cause" for termination; unconscionability of the fee; and, fee forfeiture. These issues will be addressed herein below.

## FINDINGS AND CONCLUSIONS

### A. Attorney Representation Agreement

The ARA was signed by Drake on January 24, 2012, and by Johnson on January 30, 2012. This agreement is found to fully set the necessary terms of the attorney's engagement and the 40% contingent fee arrangement. Additionally, it contains the arbitration provisions, which Drake specifically initialed. The ARA also provided that the contract "shall be construed in accordance with the laws of the State of Texas."

To avoid the contract's enforceability, Drake testified that, like all the materials provided to him, he signed the ARA without reading it. Even if such testimony was to be believed, that does not excuse him of contractual liability under Texas law. Additionally, Mr. Drake complains that the express terms, especially the arbitration provisions, were not explained to him and thus compromised his understanding of the document. Importantly, Mr. Drake possesses a college education and admits to having successfully having run at least three businesses, where the reading and understanding of contracts were involved. The credible evidence does not support Drake lacked the understanding of the ARA terms nor that he had an inadequate capacity to comprehend them.

Respondent's primary complaint was the absence of a "termination provision" which should have apprised Drake that termination without "good cause" would bind him to the 40% contingency, post termination. Respondent argues such omission prevented a "meeting of the minds" necessary to commit him to the contract. Initially, it is illogical to believe Drake was deprived of any relevant language in a contract he admittedly failed to read. More significantly, Respondent cannot offer any Texas case or legal precedent which makes such a provision a requirement to a valid fee agreement. Interestingly, the Meshbesher Retainer Agreement, signed by Drake, also does not contain such a termination provision.

From a review of the circumstances surrounding the signing of ARA and the necessary terms of such agreement, the ARA is found to be a valid and enforceable contract between the parties.

### B. Fraudulent Inducement

Respondent's claim of fraudulent inducement centers on Johnson's January 19, 2012, letter wherein it states that: "Failing to contact us may result in the closing of your file and the

loss of your rights." To support such an allegation, Drake must show that there was a (1) material misrepresentation; (2) which was false; (3) which was either known to be false when made or was asserted without knowledge of the truth; (4) which was intended to be acted upon; (5) which was relied upon; and, (6) which caused injury. *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670 (Tex. 1990).

The January letter to Mr. Drake followed the delivery of 16 months of informative material regarding the DePuy device and its medical risks and 6 months of no direct contact from the Respondent. In this context, advising Mr. Drake that closing his file could result in the "loss of your rights" was not demonstratively false or misleading. A plain reading of the language only states the obvious. Inasmuch as Drake had shown no previous interest in preserving any future claims, it would seem only logical that he would not do so going forward. Drake avers that the language misled him into believing that if he didn't sign the ARA, time was "running out" and he was "going to lose my rights if I didn't act on it." The alleged reliance by Drake, having never bothered to read anything else from JLF, and then signing but not reading the ARA, is found not to be a credible position.

Respondent's claim of fraudulent inducement is DENIED.

### C. Good Cause

Pursuant to Rule 1.15 of the Texas Disciplinary Rules of Professional Conduct ("DR" or "Rules"), a client is allowed to discharge an attorney with or without good cause. With regard to a contingency fee contract, however, the line of cases arising from *Mandell & Wright v. Thomas,* 440 S.W.2d 891 (Tex. 1969) provide that if such attorney is discharged without good cause before the representation is completed, he may seek

compensation either *in quantum meruit* or in a suit to enforce the contract by collecting the fee from any damages the client subsequently recovers, even if he fails to complete the terms of representation. While good cause is a question of fact, it generally requires a showing that the attorney has failed to perform his duty to his client in a manner that an attorney of ordinary skill and ability would have performed under similar circumstances or that the attorney materially disregarded his professional duties as expressed in the Rules.

The evidence reflects that Johnson was effectively terminated on November 29, 2012, when Drake signed a Substitution of Attorneys document and hiring Minnesota attorney, Charles H. Johnson. This termination was done without any discussion or previous complaint by Mr. Drake. In a letter from Charles Johnson to JLF on November 30, 2012, the new counsel explained his basis for termination as "an ongoing professional relationship with Mr. Drake's family" and that "they wanted a local attorney who they could actually meet with in person." Neither of those two reasons approach good cause and importantly, were made with the benefit of new counsel. In a follow-up call by Drake on December 5, 2012, he stated that "Chuck Johnson who is local and a big hitter would be taking over the case." Those admissions at the time of termination are found not to support termination for good cause.

Following termination and two law firms later, Drake raises several after-the-fact allegations for good cause. Among them, Drake claims there was a lack of attorney/client communication, and yet the call notes credibly dispute Drake's complaint of 6 unreturned calls. Likewise, Drake's complaint that he wasn't informed of the effect of a termination without cause is not compelling, especially since his decision to

terminate was made with the benefit of new counsel. Respondent alleges several other bases for good cause, including misleading, but unread, communications in the pre-contract solicitation material; a rude conversation with a member of JLF's staff; the premature filing of the short form petition with the MDL; and, a delayed delivery of Drake's file. In total, Respondent's belated reasons were self-serving, at best, and none rose to a level of good cause. They are found to be manufactured to offset the inadequate explanations actually given at the time of the termination.

At the time of the termination, Johnson had adequately fulfilled his legal duties of representation. Respondent's basis for termination of JLF is found to be without good cause.

### D. Unconscionability of the Fee

The ARA provided that Johnson was assigned a 40% contingency fee from the Respondent's recovery. As an initial matter, a 40% contingency fee is found to be within an acceptable range of the usual and customary fees charged in this type of a case. Likewise, such a fee is not, on its face, contrary to the factors observed in DR 1.04.

In making his claim of unconscionability, however, Drake cites the limited amount of professional time committed to his case prior to termination. Certainly, Johnson was terminated early in the litigation process, at a time when Respondent's medical records were limited and prior to his revision surgeries. Drake additionally complains that Johnson's fee was unconscionably disproportionate to the actual amount of work involved before the termination without cause.

In addressing these complaints, however, DR 1.04 and the attendant comments

generally provide that the circumstances at the time a fee arrangement is made should control in the question of unconscionability. See, *Hoover Slovacek LLP v. Walton*, 206 S.W.3d 560 (Tex. 2006). The testimony reflected that when Johnson accepted the case, the outcome was uncertain, with no assurance that a successful result would evolve. Additionally, JLF accepted the risks of protracted litigation, in potentially multiple forums and at an expense borne by him prior to a recovery. There was no evidence presented that when the contract was formed, Johnson accepted a risk not commensurate with a 40% contingency fee. Likewise, there was no evidence submitted that Johnson was either incapable or unwilling to complete his professional duties to recover the awards ultimately received by Drake with subsequent counsel. Based on this perspective and in context with the Disciplinary Rules, the ARA was not an unconscionable contract between the attorney and client. Further, while the decision to terminate without cause immediately subjected Drake to an economically unfavorable outcome, the principles established in *Mandell & Wright* are persuasive to reject any public policy arguments.

Respondent's claim of an unconscionable fee is DENIED.

## E. Fee Forfeiture

Finally, Drake cites *Burrow v. Arce*, 997 S.W.2d 229 (Tex. 1999) as the basis for a fee forfeiture in this case. To prevail on such a theory, Respondent must establish that Johnson committed clear and serious breaches of his ethical and fiduciary duties to Drake. This requires a factual analysis using the Disciplinary Rules for necessary guidance, as well as reviewing the gravity and timing of a violation, its willfulness and the harm to the client.

From the testimony presented by Respondent, this fee forfeiture claim was essentially no more than the factual re-casting of his previous good cause argument for termination. Just as the evidence failed to sufficiently raise good cause, it likewise was insufficient to support a breach of Johnson's ethical and fiduciary duties to Drake, and certainly not one which rose to a serious level ever contemplated by *Burrow*.

Drake's request for a fee forfeiture is DENIED.

### F. Contingency Fee

Although it is found that Johnson's 40% contingency fee was reasonable and is usual and customary in this type of case, the MDL judge assessed a "common benefit" fee applicable to all claimant attorney fee awards. The parties stipulated this during this arbitration and accordingly Johnson's fee is modified to a "net" 35% contingency.

The parties also stipulated that Meshbesher has subsequently settled Drake's A and B Settlement Award for both his left and right hip in the amount of $561,750.00, per the Settlement Program schedule that was jointly admitted. In applying Johnson's net 35% contingency, he is entitled to receive and is AWARDED an attorney fee in the amount of $196,612.50.

Additionally, the testimony reflected that there still remains a discretionary loss of earnings award (EIF Claim No. 3585) which has not yet been determined. If and when Drake recovers from this claim, Johnson is AWARDED 35% of that to be determined amount.

### G. Attorneys' Fees

Johnson seeks the recovery of his attorneys' fees expended in this arbitration as a

prevailing party for breach of contract, pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code. Drake argues, however, that no such breach has occurred. Certainly there was no breach at the time the ARA was terminated without cause, as it was Drake's right to end the relationship at any time. Thereafter, JLF put Respondent, through counsel, on notice of his 40% attorney contract lien on March 4, 2013. Subsequent to this notice, Respondent steadfastly rejected this claim and failed and refused to pay Johnson his contingency fee following recovery in the MDL. As stated in the June 30, 2014, email by Meshbesher partner, Terry Nemo, the claim for the fee was denied as to "any portion of the settlement." It is found that failure to pay Johnson his contingency fee following a recovery was a breach of the ARA.

JLF was represented throughout this matter by Ft. Worth attorneys, Thomas Needham ("Needham") and Jennifer Andrews ("Andrews") with the firm of Wallach Andrews. Both Needham and Andrews filed affidavits supporting their requests for fees and expenses. Needham initially signed a 40% contingency contract with JLF on July 15, 2014. It is found that such arrangement was not appropriate for consideration in this case because in January 2016, Needham retained Andrews to serve as co-counsel and to complete and try the case. Consequently, the assessment of fees was analyzed on an hourly basis. In addressing the hourly rate, each affidavit sought a rate of $250/hour.

In reviewing the Needham and Andrews affidavits and the attached billing records, the Arbitrator is mindful of the factors articulated in *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812 (Tex. 1997). Taking into consideration each attorney's qualifications and the nature and subject matter of the proceedings, $250/hour is found to be both reasonable and customary within the Dallas/Ft. Worth legal

community. Andrews also employed the services of attorney Cynthia Maragoudakis, at the rate of $200/hour, and paralegal, Michele Rayburn, at the rate of $95/hour. Likewise, these rates are found to be reasonable and customary.

In specifically reviewing the Needham affidavit, he has included his time for both the federal Ft. Worth suit and the Dallas JAMS arbitration. It appears that the unsuccessful federal litigation to compel this arbitration was not a necessary proceeding. While Respondent challenged jurisdiction in the arbitration proceeding, he voluntarily participated in the case without the necessity of being compelled by any court action. Accordingly, the time entries associated with the Ft. Worth suit have been disregarded in calculating the fee award.

Critically, the Needham records often reflected block billing and vague entries. The Andrews affidavit was heavily redacted, which effected the clarity of several entries. To avoid overlapping or duplicate billing, therefore, Needham's time entries were not considered after engaging Andrews in January 2016. By employing this methodology, the resulting balance of the fees incurred by each of Claimant's attorneys present an efficient and non-overlapping use of legal resources.

From a review of the billing affidavits, and considering the time involved, the complexity of the case and the multiple forums, the reasonable and necessary fee award for Needham is $47,625, and for Andrews is $88,832. Although each attorney has also requested expenses attendant to their representation, they are found to be both insufficiently specific and not the type usually associated with a Chapter 38 award.

Accordingly, Johnson is AWARDED his reasonable and necessary attorneys' fees in the amount of $136,457. Additionally, he is AWARDED his expended JAMS costs

and Arbitrator fees in the amount of $20,145.47.

## FINAL AWARD

For the foregoing reasons, it is ORDERED that:

1. The parties' Attorney Representation Agreement is found to be a valid and enforceable contract;

2. Drake's claim of Fraudulent Inducement is DENIED;

3. The parties' Attorney Representation Agreement was terminated by Drake without "good cause";

4. Drake's claim of an Unconscionable Fee is DENIED;

5. Drake's claim for Fee Forfeiture is DENIED;

6. Johnson is AWARDED his net 35% contingency fee from Drake's A and B Settlement Award in the amount of $196,612.50;

7. Johnson is AWARDED his net 35% contingency fee from Drake's discretionary loss of earnings award (EIF Claim No. 3585) to the extent of the yet determined amount and if and when Drake recovers from this claim;

8. Johnson is GRANTED a lien on Drake's recovered claims, as indicated in items 6 and 7, above;

9. Drake is found to have breached the Attorney Representation Agreement;

10. Johnson is AWARDED from Drake his attorneys' fees in the amount of $136,457;

11. Johnson's request for litigation expenses is DENIED;

12. Johnson is AWARDED from Drake his expended JAMS costs and Arbitrator costs in the amount of $20,145.47; and,

13. This Final Award resolves all issues for decision in this proceeding and all other relief not expressly granted is DENIED.

DATED: July 7, 2016.

_____
HON. GLEN M. ASHWORTH,
Arbitrator

## PROOF OF SERVICE BY E-Mail & Fax

Re: Johnson, Steven M. vs. Drake, William
Reference No. 1310021509

I, Carolina El'Azar, not a party to the within action, hereby declare that on July 07, 2016, I served

the attached Corrected Final Award on the parties in the within action by electronic mail and fax at Dallas,

TEXAS, addressed as follows:

Barry Johnson Esq.
L/O Barry N. Johnson
3116 W. Fifth St.
Suite 107
Fort Worth, TX  76107
Phone: 817-523-1330
Fax: 469-248-0602
johnsonneedhamlaw@gmail.com
   Parties Represented:
   Steven M. Johnson

Anthony Nemo Esq.
Ashleigh E. Raso Esq.
Andrew L. Davick Esq.
Meshbesher & Spence
1616 Park Avenue
Minneapolis, MN  55404
Phone: (612) 339-9121
Fax: (612) 339-9188
tnemo@meshbesher.com
araso@meshbesher.com
adavick@meshbesher.com
   Parties Represented:
   William Drake

Thomas R. Needham Esq.
L/O Thomas R. Needham
3116 W. Fifth St.
Suite 107
Fort Worth, TX  76107
Phone: 817-523-1330
Fax: 469-248-0602
johnsonneedhamlaw@gmail.com
   Parties Represented:
   Steven M. Johnson

Karin Cagle Esq.
Kirkley Law Firm, LLP
1619 Pennsylvania Ave.
Fort Worth, TX  76104
Phone: 817-721-5127
Fax: 817-335-7733
kcaglelaw@gmail.com
   Parties Represented:
   William Drake

Jennifer Morris Andrews Esq.
Wallach & Andrews, P.C.
2501 Parkview Dr.
Suite 303
Fort Worth, TX  76102
Phone: 817-338-1707
Fax: 817-338-1787
j.andrews@wallach-law.com
   Parties Represented:
   Steven M. Johnson

I declare under penalty of perjury the foregoing to be true and correct. Executed at Dallas, TEXAS on July 07, 2016

Carolina El'Azar
JAMS
celazar@jamsadr.com

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Andrea K. Drake, et al.,                           Case No. 1:13-dp-20140

        Plaintiffs,

      v.                                           MEMORANDUM OPINION
                                    AND ORDER

DePuy Orthopaedics, Inc., et al.,

        Defendants.

## I.    INTRODUCTION

Plaintiffs William and Andrea Drake have filed a motion to vacate an arbitration award obtained by Steven Johnson, Plaintiffs' former attorney, from an arbitrator in Texas. (Doc. No. 7). Johnson has filed a competing motion to confirm the arbitration award. (Doc. No. 7; 3:17-dp-20085). I previously concluded I have subject matter and personal jurisdiction over this case and Johnson and granted Plaintiffs' motion to enforce the Master Settlement Agreement. (Doc. No. 30). The Sixth Circuit denied Johnson's appeal on that decision as premature, *Drake v. DePuy Orthopaedics, Inc.*, 757 F. App'x 449 (6th Cir. 2018), and this matter now is before me for the resolution of Plaintiffs' motion to vacate and Johnson's motion to confirm. For the reasons stated below, I deny Johnson's motion, and I grant Plaintiffs' motion to vacate the arbitration award.

## II.    BACKGROUND

The Sixth Circuit accurately and succinctly summarized the factual and procedural background of this dispute, and I will reiterate that summary here for consistency:

EXHIBIT C-1

Plaintiff William Drake is a Minnesota resident. He is married to Andrea Drake, and has lived in Minnesota for approximately forty years. He received Articular Surface Replacement ("ASR") hip implants that were manufactured by DePuy Orthopaedics Inc., in both of his hips, at a hospital located in Minnesota. In 2010, DePuy recalled the ASR implants ("MDL Action") that Mr. Drake received. The Drakes learned of the recall through a television advertisement from a law firm representing persons who received DePuy ASR implants subject to this recall. Mrs. Drake called the number on the advertisement and thereafter began discussions with Johnson through his law firm. The Drakes did not know where the law firm was located when they initiated contact, but eventually learned that it was in Texas. Other than a brief layover in a Texas airport, Mr. Drake has never been to Texas.

Between September 28, 2010, and January 19, 2012, Johnson's law firm contacted the Drakes through calls and letters approximately fifty-seven times, which generally resulted in the firm leaving voicemails. During that time period, following six months of no direct contact from the Drakes, Johnson's law firm sent Mr. Drake a final letter, which stated that "[f]ailing to contact us may result in the closing of your file and the loss of your rights." . . . Five days later, on January 24, 2012, Mr. Drake signed the form contract (Attorney Representation Agreement, or "ARA") Johnson's firm had previously sent him. The ARA included an arbitration clause, stating that in the event of a dispute, arbitration would be held in Fort Worth, Texas.

On November 28, 2012, Johnson was informed by the Drakes that they intended to terminate their ARA with him, and secure different counsel. Shortly thereafter, Johnson filed a short-form complaint on behalf of the Drakes in the MDL Action in Ohio. Once the Drakes hired a local law firm to represent him, the new law firm filed a complaint in Minnesota, and the case was transferred to the Northern District of Ohio court handling this MDL. Before Johnson dismissed the complaint he filed on behalf of the Drakes, he put the Drakes' new attorneys on notice of his attorney's fee lien on any recovery from the Drakes' MDL lawsuit. Johnson dismissed the case he filed with the following stipulation:

> The parties further agree and stipulate that this dismissal shall have no effect on Plaintiff's pending case in the United States District Court, Northern District of Ohio, filed by the law firm of Meshbesher & Spence, Ltd. on January 24, 2013 (Case No. 1:30-dp-20140).

> The Parties further recognize that the Johnson Law firm has asserted a claim on any recovery the Plaintiff may make for any injuries related to the DePuy ASR for the full amount of all monies that [the Johnson Law Firm] is entitled to under the terms of its contract with the Plaintiff and that this dismissal shall have no effect on those claims.

. . .

EXHIBIT C-2

DePuy Orthopaedics, Inc. reached a settlement agreement with the plaintiff class in the MDL Action in November 2013, and the Drakes signed on to this settlement agreement shortly thereafter. The settlement agreement specifically outlines how disputes connected with the MDL Action are to be handled, which includes arbitration and the use of a Special Master and/or Claims Processor that have already been appointed through the MDL Action settlement process.

In an effort to litigate the fee dispute arising out of the MDL Action, Johnson initiated a JAMS arbitration in Dallas, Texas on July 31, 2014. The next day, he filed an action in the Northern District of Texas, Fort Worth Division, to compel the Drakes to arbitrate in Texas. . . . The Fort Worth district court dismissed Johnson's action for lack of personal jurisdiction (in personam) over Mr. Drake. The arbitration continued, despite and over the Drakes' objections to both the individual arbitrator selected and to the Texas forum.

On February 16, 2016, the Drakes initiated the ADR process regarding the parties' fee dispute, as dictated by the MDL Action settlement agreement, through Special Master Cathy Yanni of JAMS. Two days later, Johnson again moved to compel the Drakes to arbitration in Texas, this time filing in a Dallas district court. Special Master Yanni issued an order dismissing the Drakes' arbitration request on the basis that she did not have jurisdiction over the matter because it was already pending in a different forum with another JAMS arbitrator. Shortly afterwards, before the district court in Dallas issued any substantive rulings, Johnson voluntarily dismissed that action.

The Texas arbitrator issued a final award in favor of Johnson on June 22, 2016 (later corrected for a typographical error and re-issued on July 7, 2016). Of the Drakes' settlement award, the arbitrator authorized over sixty-two percent to be distributed to Johnson, Johnson's attorneys, and the JAMS arbitration process. Johnson then filed another action in the district court in Dallas, where he moved that the court confirm the arbitration award. The Drakes then filed a motion to enforce the MDL Action settlement agreement and to vacate the arbitration award in the Ohio district court. The Ohio district court granted the Drakes' motion to enforce the settlement agreement and did not reach the motion to vacate the arbitration award. The next day, the Dallas district court sua sponte transferred Johnson's motion to confirm the arbitration award to be consolidated with the MDL case in the Ohio district court. Johnson timely appealed the Ohio district court's order.

*Drake*, 757 F. App'x at 450–52 (6th Cir. 2018) (footnotes and internal citations omitted) (alterations

added).

The Sixth Circuit concluded it did not have appellate jurisdiction over Johnson's appeal

because my earlier order did not resolve "the issue of how to deal with the arbitration award . . . ."

EXHIBIT C-3

*Id.* at 453. The court of appeals remanded the case for further consideration of Johnson's motion to confirm and the Drakes' motion to vacate.

### III.   ANALYSIS

Federal law "mandate[s] the enforcement of arbitration agreements." *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984). Arbitration agreements are "irrevocable . . . save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *see also Salvano v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 647 N.E.2d 1298, 1302 (N.Y. 1995) (Arbitration agreements are governed by "the accepted rules of contract law."); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227–28 (Tex. 2003) ("[W]hen deciding whether the parties agreed to arbitrate, 'courts generally . . . should apply ordinary state-law principles that govern the formation of contracts.'") (quoting *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995)).

The Drakes and Johnson entered into the ARA in January 2012. The ARA stated that Texas law applied to the terms of that agreement. (Doc. No. 10-4 at 1). While the ARA does not contain a provision governing amendments to the contract, Texas law plainly contemplates that parties to a contract may amend their written arbitration agreement through a subsequent writing. *See, e.g., J.M. Davidson, Inc.*, 128 S.W.3d at 227–29.

The Drakes and Johnson later became subject to another agreement – the 2015 ASR Settlement Agreement dated March 2, 2015 (the "2015 Settlement Agreement"), which modified and extended the initial ASR Settlement Agreement dated November 19, 2013 (the "2013 Settlement Agreement"). The Drakes settled their claims under the 2013 Settlement Agreement, though those claims still were active in the claims process when the 2015 Settlement Agreement took effect.

An MDL court's "inherent authority" to create and enforce mechanisms which "bring management power to bear upon massive and complex litigation" is well established. *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 648 (E.D. La. 2010) (discussing a court's authority to assess

common benefit attorneys' fees against a pool of funds used to compensate MDL plaintiffs and

attorneys) (quoting *In re Air Crash Disaster at Fl. Everglades on Dec. 29, 1972,* 549 F.2d 1006, 1012 (5th

Cir. 1977)). So too is the requirement that a court "exercise supplemental jurisdiction over fee

disputes that are related to the main action." *Kalyawongsa v. Moffett*, 105 F.3d 283, 287-88 (6th Cir.

1997).

Johnson's claims, which are dependent upon a recovery by the Drakes "by way of

settlement, judgment or otherwise," (Doc. No. 10-4 at 1), are squarely based upon the Master

Settlement Agreement. The amount, scope, and timing of the Drakes' recovery under the U.S.

Program (the private claim resolution program established by the 2013 Settlement Agreement and

revised by the 2015 Settlement Agreement) is determined by the provisions of the 2015 Settlement

Agreement. That agreement specifically provides that any dispute concerning the 2015 Settlement

Agreement or "any U.S. Program Claim . . . shall be submitted to the Claims Administrator who

shall sit as a binding arbitration panel and whose decision shall be final, binding and Non-

Appealable." (2015 Settlement Agreement, § 14.1.2).

The fact that Johnson no longer represented the Drakes at the time they entered into the

2013 Settlement Agreement does not alter the conclusion that Johnson's claim for his alleged lien is

governed by the terms of that and subsequent Settlement Agreements. Johnson represents

numerous plaintiffs who settled their claims pursuant to one or more of the ASR Settlement

Agreements. Moreover, even a plaintiff who is not a signatory to a contract containing an

arbitration agreement "may be compelled to arbitrate if his claims are 'based on a contract'

containing an agreement to arbitrate." *Branch Law Firm L.L.P. v. Osborn*, 532 S.W.3d 1, 12 (Tex.

App. 2016) (quoting *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005)); *see also Belzberg

v. Verus Invest. Holdings Inc.*, 999 N.E.2d 1130 (N.Y. 2013) (holding a nonsignatory is bound by an

agreement containing an arbitration clause when the nonsignatory directly derives a benefit from the agreement).

In short, the Drakes and Johnson agreed to a contract which contained a binding arbitration provision – the 2015 Settlement Agreement. The subsequent arbitration Johnson initiated and pursued, however, did not comport with the parties' agreement. Permitting a party to any contract – to say nothing of one governing an area as broad and complex as the area this MDL addresses – to choose which provisions of that agreement it will abide by, and which it won't, simply is untenable. What is more problematic, in this case, is that it also violates federal law.

The Federal Arbitration Act provides that a party which has been "aggrieved by the alleged failure . . . of another to arbitrate under a written agreement for arbitration may petition . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. More precisely, to these circumstances, "[i]f in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method <u>shall</u> be followed . . . ." 9 U.S.C. § 5 (emphasis added). Parties to an arbitration agreement "may specify *with whom* they choose to arbitrate their disputes." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 683 (2010) (emphasis original).

The 2015 Settlement Agreement expressly provides a specific process for arbitration and identifies a particular arbitrator. The Texas arbitration neither followed that process nor used that arbitrator. "[A]rbitration awards made by arbitrators not appointed under the method provided in the parties' contract <u>must be vacated</u>." *PoolRe Ins. Corp. v. Organizational Strategies, Inc.*, 783 F.3d 256, 263 (5th Cir. 2015) (quoting *Brook v. Peak Int'l, Ltd.*, 294 F.3d 668, 673 (5th Cir. 2002)) (emphasis added).

Therefore, I vacate the Texas arbitration award and order the Drakes and Johnson to adhere to the arbitration procedures set forth in the 2015 Settlement Agreement, including arbitration

EXHIBIT C-6

before the Claims Administrator or, if the Claims Administrator is unable to preside over the

arbitration, before "one of the Special Masters who has not rendered any decision with regard to the

matter at issue . . . ." (2015 Settlement Agreement, § 14.1.2 - 14.1.3).

### IV. CONCLUSION

For the reasons stated above, I deny Johnson's motion to confirm the arbitration award,

grant the Drakes' motion to vacate the arbitration award, and order the parties to proceed with

arbitration as contemplated by the 2015 Settlement Agreement.

So Ordered.


<u>s/ Jeffrey J. Helmick</u>
United States District Judge

EXHIBIT C-7

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Steven M. Johnson,                                Case No. 1:17-dp-20085

          Petitioner,

      v.                                            JUDGMENT ENTRY

William Scott Drake,

          Respondent.


     For the reasons stated in the Memorandum Opinion and Order filed in *Drake v. DePuy Orthopaedics, Inc.,* Case. No. 1:13-dp-20140, I deny the motion of Steven Johnson to confirm the arbitration award, grant the motion of William and Andrea Drake to vacate the arbitration award, and order the parties to proceed with arbitration as contemplated by the 2015 Settlement Agreement.

     So Ordered.


                          s/ Jeffrey J. Helmick
                          United States District Judge


EXHIBIT D

# UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540

Deborah S. Hunt
Clerk

POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  December 15, 2020

Robert Dolan Akers
3116 W. Fifth Street
Fort Worth, TX 761072140

Marla Broaddus
Michael Truesdale
Enoch Kever
7600 N. Capital of Texas Highway, Suite 200
Austin, TX 78730

Mr. Andrew L. Davick
Meshbesher & Spence
2519 Commerce Drive, N.W., Suite 120
Rochester, MN 55901

Mr. Derek Irwin Stewart
Meshbesher & Spence, 1616 Park Avenue
Minneapolis, MN 55404

    Re:  Case Nos. 19-4074/19-4075, *Andrea Drake, et al v. DePuy Orthopaedics, Inc., et al*
         Originating Case Nos. : 1:13-dp-20140; 1:17-dp-20085

Dear Counsel,

   The Court issued the enclosed opinion today in this case.

                         Sincerely yours,

                         s/Cathryn Lovely
                         Opinions Deputy

cc:  Ms. Sandy Opacich

Enclosure

Mandate to issue

EXHIBIT E-2

NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0696n.06

Nos. 19-4074/4075

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

<table>
<tr><td>

In Re: DEPUY ORTHOPAEDICS, INC. ASR HIP IMPLANT PRODUCTS LIABILITY LITIGATION.

_____

**19-4074**

ANDREA K. DRAKE; WILLIAM S. DRAKE,

    Plaintiffs-Appellees,

    v.

DEPUY ORTHOPAEDICS, INC., et. al.,

    Defendants,

STEVEN M. JOHNSON, d/b/a THE JOHNSON LAW FIRM,

    Petitioner-Appellant.

**19-4075**

STEVEN M. JOHNSON,

    Petitioner-Appellant,

    v.

WILLIAM S. DRAKE,

    Respondent-Appellee.

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

**FILED**
Dec 15, 2020
DEBORAH S. HUNT, Clerk

On Appeal from the United States District Court for the Northern District of Ohio

</td></tr>
</table>

**Before: GUY, CLAY, and KETHLEDGE, Circuit Judges.**

    **RALPH B. GUY, JR., Circuit Judge.**  These appeals involve the arbitration of a contingent fee dispute between an attorney and his former client after the client obtained a

settlement of his underlying claims through the DePuy ASR Hip Implant Products Liability

Litigation (MDL No. 2197).  Attorney Steven M. Johnson d/b/a The Johnson Law Firm, initiated

arbitration in Texas against his former client William Drake pursuant to their Attorney

Representation Agreement (ARA), which ultimately resulted in a final arbitration award in

Johnson's favor for more than $350,000.  Moving to vacate that award, Drake sought to force

Johnson to arbitrate their fee dispute anew before a Special Master appointed under the MDL's

Master Settlement Agreement (MSA).  The district court sided with Drake twice—once before

and once after we dismissed Johnson's first appeal for lack of jurisdiction.  *Drake v. DePuy*

*Orthopaedics, Inc.*, 757 F. App'x 449, 452 (6th Cir. 2018).

Johnson's latest appeals are from the district court's orders on remand: (1) denying

confirmation of the arbitration award in Johnson's favor; (2) vacating that arbitration award; and

(3) ordering the parties to arbitrate their fee dispute again pursuant to the MSA.  *Drake v. DePuy*

*Orthopaedics, Inc.*, No. 1:13-dp-20140, 2019 WL 4750608 (N.D. Ohio Sept. 30, 2019) (MDL);

*Johnson v. Drake*, No. 1:17-dp-20085 (Order R. 54) (N.D. Ohio Sept. 30, 2019) (Transferred

Motion to Confirm Award).  To be clear, the issue is not *whether* the parties agreed to arbitrate

any fee disputes between them under the express terms of the ARA—everyone accepts that they

did.  The question is whether it was error to vacate the arbitration award on the grounds that the

initial agreement to arbitrate was amended, modified, or otherwise superseded by the provisions

of the MSA.  Because the district court's reliance on a mix of contract principles, estoppel theory,

and inherent authority does not withstand scrutiny, we **REVERSE** and **REMAND** for further

proceedings consistent with this opinion.[1]

---

[1] Although judgment has not been entered in the Drakes' MDL case under 28 U.S.C. § 1291, an
appeal may be taken from orders "denying confirmation of an award" or "vacating an award," 9

I.

Minnesota resident William Drake underwent bilateral hip replacement surgeries in 2007. The implants he received—DePuy Articular Surface Replacement (ASR) hip devices—were recalled in 2010. Many lawsuits followed and, by the end of 2010, the Judicial Panel on Multidistrict Litigation had ordered the transfer of the first of thousands of federal ASR hip implant actions to the Northern District of Ohio for coordinated or consolidated pretrial proceedings. *See* 28 U.S.C. § 1407(a) (providing that each action "be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated").

A.  Johnson's Representation

Drake's wife Andrea saw and responded to a solicitation from the Johnson Law Firm relating to the DePuy recall. Letters and calls were directed to the Drakes for more than a year, until a final warning letter prompted Drake to engage Johnson to represent him in January 2012. Under the Attorney Representation Agreement (ARA or Fee Agreement), Johnson would bring Drake's claims against the manufacturer and distributor of the ASR hip device and would receive a contingent attorney's fee of 40% of whatever was recovered "by way of settlement, judgment, or otherwise." The ARA specified that it would be governed by Texas law, contained an integration clause, and was silent regarding subsequent amendment or modification.

Significant for our purposes, Drake expressly agreed to "binding arbitration of any disputes between the client and the Firm." More specifically, Drake and Johnson agreed that "any dispute arising from the interpretation, performance, or breach of this Fee Agreement . . . shall be resolved

---

U.S.C. § 16(a)(1)(D)-(E). Also, judgment was entered in the action transferred from the district court in Texas, and an appeal may be taken from "a final decision with respect to an arbitration that is subject to this title." 9 U.S.C. § 16(a)(3).

by final and binding arbitration conducted in Fort Worth, by any other arbitrator that The Firm

may choose." The ARA did not otherwise specify the arbitrator or incorporate any arbitration

rules to govern such an arbitration.

Johnson represented Drake for less than a year. In that time, Johnson notified DePuy of

Drake's ASR-related claims, obtained medical records, and waited for Drake's revision surgery to

be scheduled. At the end of November 2012, the Firm was advised that Drake was terminating its

representation; Johnson filed a "short form" complaint in the MDL on Drake's behalf anyway; and

Drake retained as substitute counsel Minnesota Attorney Charles Johnson (no relation to Steven

Johnson). Although the sequence of and justifications for those actions were contested in the

Texas arbitration proceeding, the fact that they occurred was not.[2]

Not long after terminating Johnson's representation, Drake underwent revision surgery and

changed counsel one last time. The Drakes have been represented ever since by the Minnesota

law firm of Meshbesher & Spence, Ltd.—both in the MDL case and the fee dispute with Johnson.

### B. Drake's Settlement

A new complaint alleging the Drakes' ASR-related claims was filed in federal court in

Minnesota in early 2013. That became the operative pleading after it was transferred to the

Northern District of Ohio for pretrial proceedings in the DePuy ASR Hip Implant Products

Liability Litigation. *See Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 413 (2015) (noting that

"[c]ases consolidated for MDL pretrial proceedings ordinarily retain their separate identities").

That transfer called attention to the "short-form" complaint previously filed by Johnson on Drake's

---

[2] The arbitrator ultimately found that Drake did *not* have "good cause" to fire Johnson, which, under Texas law, meant that Johnson was not limited to a *quantum meruit* recovery and was able to enforce the contract and collect the full contingent fee once Drake recovered on the underlying claim. *See Mandell & Wright v. Thomas*, 441 S.W.2d 841 (Tex. 1969).

behalf.  Johnson stipulated to its dismissal, but not without asserting a contingent fee claim "for the full amount of all monies that JLF is entitled to under the terms of its contract with the Plaintiff and that this dismissal shall have no effect on those claims."

The MDL proceeded with extensive discovery conducted by lead counsel for plaintiffs and defendants, and, by mid-2013, the number of cases filed in the MDL docket exceeded 8,500. *Drake v. DePuy Orthopaedics, Inc.*, No. 13-dp-20140, 2017 WL 6502489, at *1 (N.D. Ohio Dec. 19, 2017).  DePuy and a committee of plaintiffs' attorneys (which did not include Johnson) reached a private global settlement agreement in late 2013.  The settlement—formalized as the Master Settlement Agreement (MSA)—created an "opt-in" program funded by DePuy for the settlement of the ASR-related claims, filed and unfiled, of eligible U.S. claimants who underwent revision surgery prior to August 31, 2013.  Under the MSA, eligible claimants (including Drake) could choose to settle by "enrolling" in the program and agreeing to have their claims decided in a private administrative process with the release of all claims against the defendants.

In particular, the MSA appointed three Special Masters "to oversee the administration of claims for benefits and to make final and binding determinations under this Agreement with the authority of an Arbitrator under the Federal Arbitration Act." (MSA § 12.4.2.)  The MSA provided for "final, binding and Non-Appealable" arbitration of "any dispute that arises under or otherwise in connection with . . . any U.S. Program Claim." (MSA § 14.1.2.)  An arbitration would be initiated by serving a demand on the Special Master, and, unless the parties agreed otherwise, the arbitration would be governed by the American Arbitration Association (AAA)'s Commercial Arbitration Rules. (MSA § 14.1.3.2.)

Through counsel, the Drakes enrolled in the MSA's settlement program in early 2014. Drake was approved for Part A and Part B settlement awards totaling $561,750, which triggered

Johnson's contingent fee claim. Drake also filed a claim under the MSA's Extraordinary Injury Fund (EIF), although it is not clear whether that claim is still pending. The Drakes re-enrolled after the MSA was modified and extended to cover U.S. claimants who had revision surgery prior to January 31, 2015. For our purposes, the relevant provisions of the 2013 MSA remained unchanged in the 2015 MSA.[3]

### C. Arbitration of the Contingent Fee Claims

Drake's counsel proposed that the fee dispute be arbitrated before a Special Master under the MSA. Instead, Johnson initiated an arbitration with JAMS in Dallas, Texas. Johnson also filed a motion to compel arbitration, which was dismissed for lack of personal jurisdiction by the federal court in Texas. The JAMS arbitration proceeded over Drake's objections, and the arbitrator was selected. The arbitration hearing was delayed for settlement discussions, but a settlement was never finalized.

So, in early 2016, Drake formally invoked the MSA's arbitration process and a JAMS arbitration was referred to Special Master Cathy Yanni. Johnson objected to the arbitration on several grounds and also filed (and later dismissed) a second motion to compel arbitration in federal court in Texas. That detour did not last long, however, because Special Master Yanni quickly dismissed the arbitration for lack of jurisdiction. Johnson contends that the dismissal should be understood as an implicit determination that the dispute was not arbitrable under the MSA, although the brief order did not say that. Instead, the order stated that the Special Master had been "unaware and not informed of the arbitration already proceeding before Judge Ashworth" in the Dallas JAMS proceeding. The only reasons given are at least as likely to imply that the

---

[3] The district court noted that the MSAs and other forms are available on the website for the U.S. ASR Hip Settlement. *Drake*, 2017 WL 6502489, at * 6 (citing www.usasrhipsettlement.com).

dismissal was based on deference to the first-filed and still pending Dallas JAMS proceeding. *See Drake*, 757 F. App'x at 452 (describing this dismissal as based on lack of "jurisdiction over the matter because it was already pending in a different forum with another JAMS arbitrator").

The arbitration hearing was finally conducted in the Dallas JAMS proceeding. The arbitrator issued a final corrected arbitration award in Johnson's favor in July 2016. The arbitrator's written decision rejected Drake's defenses and counterclaims—including his claim of fraudulent inducement, his defense that the ARA was terminated for "good cause," and his challenges to the contingent fee on the grounds of forfeiture and unconscionability. After finding that Drake had breached the contract, Johnson was awarded: (1) a net contingency fee of 35% of the Part A and Part B settlement awards in the amount of $196,612.50 (as well as on any future EIF recovery); (2) a lien against Drake's recovery to the extent of that fee; and (3) contract damages for the attorney's fees and costs incurred in the arbitration in the amount of $136,457 and $20,145.47, respectively. Altogether, Johnson was awarded $353,214.97. That did not end the matter.

### D. Federal Court Proceedings

Johnson filed a new action for confirmation of the award in the Texas federal court, while the Drakes countered with a motion filed in the Ohio MDL to vacate the arbitration award and enforce the MSA. The Texas action was later transferred to Ohio to be decided with the MDL proceedings. The Ohio district court decided to order the parties to arbitrate the fee dispute again under the MSA. *See Drake*, 2017 WL 6502489, at *9. Johnson appealed, but this court remanded with instructions for the district court to also decide the competing motions to confirm or vacate the arbitration award. *Drake*, 757 F. App'x at 454. On remand, the district court vacated the arbitration award because the arbitration "did not comport with the parties' agreement" and

ordered the parties "to adhere to the arbitration procedures set forth in the 2015 [Master] Settlement Agreement." *Drake*, 2019 WL 4750608, at * 4. This appeal followed.

II.

The Federal Arbitration Act restricts judicial review of an arbitration award to the statutory grounds for vacating, modifying, or correcting an award under 9 U.S.C. §§ 10-11. *See Hall Street Assoc., LLC v. Mattel, Inc.*, 552 U.S. 576, 584 (2008). Drake abandoned his argument for vacatur based on partiality, 9 U.S.C. § 10(a)(2), but the FAA did not prevent Drake from otherwise challenging the validity of the agreement to arbitrate the fee dispute after the award. *See PolyOne Corp. v. Westlake Vinyls, Inc.*, 937 F.3d 692, 698 (6th Cir. 2019). Such a challenge could be foreclosed by waiver if the party consented to the arbitration, but the district court found no waiver here because the record was "replete with Drake's assertions that the MDL is the proper forum for resolution of any fee dispute." *Drake*, 2017 WL 6502489, at *8. Johnson does not contest that finding, so we assume that waiver does not apply here.

A.  Arbitrability

Arbitration agreements are placed "on equal footing with all other contracts," *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006), and must be enforced "according to their terms," *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010). This also means that "parties may agree to have an arbitrator decide not only the merits of a particular dispute but also '"gateway" questions of "arbitrability," such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.'" *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (quoting *Rent-A-Center*, 561 U.S. at 68-69). An agreement to arbitrate questions of arbitrability may not be disregarded, but such a delegation requires "clear and unmistakable" evidence that the parties agreed to have the arbitrator decide those issues. *In*

Case Nos. 19-4074/4075                                                                                     9
*Drake v. Johnson, d/b/a The Johnson Law Firm*

*re Automotive Parts Antitrust Litigation*, 951 F.3d 377, 382 (6th Cir. 2020) (quoting *Rent-A-Center*, 561 U.S. at 69 n.1).

As alluded to earlier, Johnson contends that the Special Master's dismissal of the second JAMS proceeding was a binding determination that the fee dispute was *not* arbitrable under the MSA. Assuming that the parties agreed to have JAMS Rules govern that arbitration, the Special Master would have been delegated the authority "to determine jurisdiction and arbitrability issues as a preliminary matter." JAMS Rule 11(b). (No. 17-dp-20085, Page ID # 549.) Otherwise, the MSA's incorporation of the AAA's Commercial Arbitration Rules could provide "clear and unmistakable" evidence of an agreement to arbitrate questions of arbitrability. *See Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 845-46 (6th Cir. 2020) (discussing incorporation of AAA rules which provide that the arbitrator has "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement").[4]

But, regardless of what may be implied from the Special Master's order of dismissal, "arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." *In re Automotive Parts*, 951 F.3d at 382 (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)). As a result, even when issues of arbitrability have been committed to an arbitrator, courts must first decide any disagreement concerning "the formation of the parties' arbitration agreement." *Id.* at 383 (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 298 (2010)). Indeed, this court has

---

[4] The same cannot be said for the ARA, which did not incorporate similar rules to govern any arbitration. Nor does the ARA's provision for arbitration of any dispute arising from the "interpretation, performance, or breach of this Fee Agreement" provide comparably "clear and unmistakable" evidence that the parties agreed to have the arbitrator decide questions of arbitrability.

expressly refused "to merge challenges to the validity of an agreement ('whether it is legally binding') with challenges to the existence of an agreement in the first instance ('whether it was in fact agreed to' or 'was ever concluded')." *Id.* at 385 (citations omitted); *see also Blanton*, 962 F.3d at 848-49 (explaining that the court must decide a non-signatory's challenge to the existence of an agreement to arbitrate even if the agreement incorporates the AAA Rules).

## B.  Agreement to Arbitrate

The starting place then is the existence of an arbitration agreement between the parties. *See Taylor v. Pilot Corp.*, 955 F.3d 572, 576 (6th Cir. 2020).  State law governs the formation of contracts, even though federal law determines whether the parties agreed to arbitrate questions of arbitrability.  *Blanton*, 962 F.3d at 846-47.  The district court's decisions regarding the existence of a valid arbitration agreement are reviewed *de novo*.  *In re Automotive Parts*, 951 F.3d at 381.

The glaringly undisputed fact is that Johnson and Drake expressly agreed in the 2012 ARA that "any dispute arising from the interpretation, performance, or breach of this Fee Agreement . . . shall be resolved by final and binding arbitration conducted in Fort Worth, by any other arbitrator that The Firm may choose."  The district court concluded, however, that this was no longer the operative agreement because the parties had agreed to arbitrate their disputes under the provisions of the MSA.  The district court's analysis rests on a mixture of contract principles, estoppel theory, and its inherent authority to manage complex litigation.  *Drake*, 2019 WL 4750608, at *3-4.  We address each in turn.

### 1.  Contract Principles

The district court began with the unremarkable observation that Texas law recognizes that parties may "amend their written arbitration agreement through a subsequent writing."  *Drake*, 2019 WL 4750608, at *3 (citing *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227-28 (Tex.

2003)).  Here, however, there is no subsequent writing between the parties agreeing to amend or modify the arbitration provisions in the ARA.  Instead, the district court concluded that Drake and Johnson both "became subject to" the 2015 MSA (which extended the 2013 MSA) and, therefore, they had "agreed to a contract which contained a binding arbitration provision."  *Id*. at *3 and *4. That is not the same as an agreement between them to arbitrate their contingent fee disputes before a Special Master pursuant to the MSA—rather than before an arbitrator of the Firm's choosing in Texas.  A closer look at the MSA is necessary.

Recall that the MSA is an agreement to establish a private settlement program, to which an eligible U.S. Claimant may "opt in."  Neither Drake nor Johnson are "parties" to the MSA itself— it is an agreement between DePuy and a committee of plaintiffs' attorneys (that did not include Johnson).  The Drakes argue that the fee dispute with Johnson is arbitrable under the MSA, which provides for arbitration of "any dispute that arises under or otherwise in connection with . . . any U.S. Program Claim."  (MSA § 14.1.2.)  But the Drakes are wrong to suggest that this definition of *what* disputes are arbitrable is an answer to the distinct question of *who* has agreed to arbitrate such disputes.  *See, e.g.*, *In re Automotive Parts*, 951 F.3d at 385.

The MSA actually sheds light on *who* agreed to submit such disputes to arbitration in the preceding subsection:  "Each Party, and by submitting an Enrollment Form and Release, each Enrolling U.S. Program Claimant and Enrolling Counsel, agrees that authority over the process . . . resides with those Persons appointed pursuant to this Agreement to exercise that authority in making the determinations with respect to claims submitted to the U.S. Program to do so with the authority of Arbitrators under the Federal Arbitration Act."  (MSA § 14.1.1.)  In other words, it is the enrollment that operates as consent to the dispute resolution process with respect to that enrolled U.S. Program claim.  As an enrolling claimant, Drake certainly consented to the

arbitration process for any dispute arising under or in connection with *his* U.S. Program claim. While Johnson enrolled *other* claimants in the settlement program and would be bound to arbitrate disputes arising under or in connection with *those* U.S. Program claims, Johnson was not Drake's enrolling counsel (and did not represent him at any time after the MSA was approved). Although Johnson was *an* enrolling counsel for *other* U.S. Program claimants, that did not contractually bind Johnson to arbitrate disputes vis a vis Drake's U.S. Program claim.

Nor does the district court's passing citation to *Branch Law Firm LLP v. Osborn*, 532 S.W.3d 13-18 (Tex. App. 2016), support a contrary conclusion. Unlike here, the MSA in that case settled all of the Avandia claims belonging to clients of the "Participating Law Firms"; was signed by Turner Branch, as a member of the Lead Participating Law Firm, on behalf of all "Participating Law Firms"; and expressly bound "Each Participating Law Firm, including all its current and future attorney members of or affiliated with each firm," to the terms and conditions of the MSA. *Id.* at 15 and 16. Those terms included an express agreement to arbitrate disputes, including those "between or among Participating Law Firms and/or members of Participating Law Firms arising out of or in connection with this Agreement." *Id.* at 16. Because Osborn was an attorney employed as an associate of a Participating Law Firm, he was contractually bound under agency principles to the terms and conditions of the MSA—including the arbitration provision. *Id.* at 18.

Section 14.1 of the MSA does not establish that Johnson and Drake amended their prior agreement to arbitrate any fee disputes under the ARA. Nor have the Drakes identified any other contractual basis that would bind Johnson to arbitrate his contingent fee claims under the MSA.

### 2. Direct Benefits Estoppel

The district court also invoked the doctrine of "direct benefits estoppel," which is a type of equitable estoppel that applies in the arbitration context. *See In re Kellogg Brown & Root, Inc.*,

166 S.W.3d 732, 739 (Tx. 2005).  "In the archetypal direct-benefits case, the party opposing arbitration seeks to enforce the terms of an agreement with an arbitration clause."  *Jody James Farms, JV v. Altman Group, Inc.*, 547 S.W.3d 624, 637 (Tx. 2018).  But Johnson sought to enforce the terms of the Fee Agreement—not the MSA.

"A person who has not agreed to arbitrate may nevertheless be compelled to do so when the person 'seeks, through the claim, to derive a direct benefit from the contract containing the arbitration provision.'"  *In re Morgan Stanley & Co., Inc.*, 293 S.W.3d 182, 184 n.2 (Tx. 2009) (quoting *In re Kellogg Brown & Root*, 166 S.W.3d at 741).  The district court pointed out that Johnson's fee claims are "dependent upon a recovery by the Drakes," which, in turn, is "squarely based upon the Master Settlement Agreement."  *Drake*, 2019 WL 4750608, at *3.  Even so, Johnson's contingent fee claims did not seek to enforce any terms of the MSA against Drake.

The district court also relied on the fact that Johnson had represented numerous *other* plaintiffs who settled *their* ASR-related claims "pursuant to one or more of the ASR Settlement Agreements."  *Id.* at *4.  The fact that he represented *other* plaintiffs in *other* MDL cases is not a direct benefit for purposes of this estoppel doctrine.  And, to the extent that Johnson's contingent fee claim may have derived indirect benefits from the MSA, the MSA required a "holdback" of 5% of attorney's fees from the settlement award for the common benefit fund.  (MSA § 4.1.8.)

### 3.  Inherent Authority

The district court also made passing reference to the "MDL court's 'inherent authority' to create and enforce mechanisms which 'bring management power to bear upon massive and complex litigation.'"  *Drake*, 2019 WL 4750608, at *3 (quoting *In re Vioxx Prods. Liability Litigation*, 760 F. Supp. 2d 640, 648 (E.D. La. 2010)).  The mechanism adopted in *In re Vioxx* involved the MDL court's assessment of common benefit attorney's fees to compensate the lead

counsel's work in the MDL.  The MSA in this case employed a similar common benefit fund mechanism, but that was not challenged by the competing motions to confirm or vacate the arbitration award.

"[A]n MDL court has broad discretion to create efficiencies and avoid duplication—of both effort and expenditure—across cases within the MDL." *In re Nat'l Prescription Opiate Litigation*, 956 F.3d 838, 841 (6th Cir. 2020).  The coordination of effort in the MDL here illustrates the advantages that MDL litigation can offer.  "But the law governs an MDL court's decisions just as it does a court's decisions in any other case." *Id.* at 844.  For example, because § 1407 only authorizes transfers for pretrial proceedings, the Supreme Court held that an MDL court could not transfer such a case to itself for trial under 28 U.S.C. § 1404.  *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 40 (1998).

The district court's power to compel arbitration under the MSA is no greater in the MDL context than in any other case.  Substantive law dictates that "no matter how strong the federal policy favors arbitration, arbitration is a matter of contract between the parties, and one cannot be required to submit to arbitration a dispute which it has not agreed to submit to arbitration." *In re Automotive Parts*, 951 F.3d at 383 (citation omitted).  It was error in this case to find that the parties' express agreement to arbitrate under the ARA was subsequently amended, modified, or otherwise superseded by the arbitration provisions of the MSA.

\*       \*       \*

The district court's orders denying confirmation and vacating the arbitration award in Johnson's favor are **REVERSED** and the cases are **REMANDED** for further proceedings consistent with this opinion.

         **CLAY, Circuit Judge, dissenting.** This appeal raises the rather unusual question of how

a dispute is to be arbitrated, rather than the more commonplace issue of arbitrability per se. The

parties agree that an arbitrator must decide to what extent, if any, an attorney is entitled to a fee

contingent on his former client's settlement in a multi-district litigation ("MDL"). However, for

over six years, in four federal cases and two arbitrations, as well as for the second time before this

Court, that attorney and the client who terminated him in 2012 have vigorously litigated whether

the applicable arbitration procedures are determined by reference to their bilateral Attorney

Representation Agreement ("ARA") or a Master Settlement Agreement ("MSA") reached in the

MDL.1 The district court did not err in concluding that the attorney consented to arbitrate disputes

under the MSA or that his claim for a contingent fee was encompassed by that agreement. The

majority holds otherwise and concludes that, because the attorney did not represent his former

clients when they entered into the MSA, he did not consent to arbitrate this dispute under it.

Because that reasoning contravenes the explicit terms of the MSA, I respectfully dissent.

**I.       Background**

         William S. Drake and his wife Andrea K. Drake ("the Drakes") retained attorney Steven

M. Johnson to represent them in claims relating to William's articular surface replacement

("ASR") hip implant.2 William underwent his hip replacement in or before 2008. The

manufacturer, DePuy Orthopaedics, recalled the ASR hip in 2010 due to widespread failures of

---

[1] All references to the MSA are to the 2015 MSA, rather than the 2013 version, which the majority
recognizes is unchanged for the issues relevant to this appeal. Citations are to the complete copy
available at the website indicated by the district court, www.usasrhipsettlement.com. *Drake v.
DePuy Orthopaedics, Inc.* ("*Drake* I"), Case No. 1:13-dp-20140-JJH, 2017 WL 6502489, at *6
(N.D. Ohio Dec. 19, 2017).

[2] While it appears that only William was a party to the ARA, William and Andrea are referred to
collectively in the district court's order, and that practice is followed here.

the device. Numerous suits followed, and the Judicial Panel on Multidistrict Litigation centralized the actions involving the recalled devices in the Northern District of Ohio.

Johnson was hired by the Drakes in January 2012 pursuant to an Attorney Representation Agreement. The engagement was limited to claims relating to the DePuy ASR hip device and provided that Johnson would be compensated by a 40% contingent fee, exclusively out of a share of the recovery, if any, "by way of settlement, judgment or otherwise . . . ." (ARA, R. 10-4, Page ID #267.) 3 Johnson was granted a lien on the ASR cause of action, and the parties agreed that "any dispute arising from the interpretation, performance, or breach of the" ARA "shall be resolved by final and binding arbitration conducted in Fort Worth, by any other arbitrator that The Firm may choose." (*Id.*) The ARA was signed after approximately fifty-seven calls and letters to the Drakes over nearly sixteen months by Johnson's law firm. The last communication sent by Johnson stated "[f]ailing to contact us may result in the closing of your file and the loss of your rights." (Corr. Final Award, R. 10-3, Page ID #252.)

Less than a year later, the Drakes terminated Johnson's representation and retained other counsel. On November 28, 2012, Andrea called Johnson's law firm to express some doubts about maintaining their representation and explain that the Drakes might hire another lawyer. On November 30, 2012, Johnson filed a document captioned as a "Short Form Complaint for DePuy Orthopaedics, Inc. ASR Hip Implant Products Liability Litigation," in the Northern District of Ohio. That same day, Johnson was notified that the Drakes had hired another attorney to represent them in connection with ASR hip claims. Johnson responded to the Drakes' new counsel by giving notice of a claimed lien of 40% of any amount recovered in the DePuy suit. The Drakes' subsequent counsel filed an ASR hip case against DePuy and related entities on January 24, 2013.

---

3 Citations to the district court record ("R.") refer to Case No. 1:13-dp-20140-JJH (N.D. Ohio).

The case was transferred to the Northern District of Ohio for MDL consolidated proceedings. The

action initiated by Johnson on the Drakes' behalf was dismissed pursuant to stipulation on June

26, 2013. The parties "recognize[d] that the Johnson Law firm [*sic*] has asserted a claim on any

recovery [the Drakes] may make for any injuries related to the DePuy ASR for the full amount of

all monies that JLF is entitled to under the terms of its contract with [the Drakes] and that this

dismissal shall have no effect on those claims." (Stipulation of Dismissal, R. 11-2, Page ID #361.)

A global settlement was reached between DePuy and a committee of plaintiffs' attorneys

in November 2013. *Drake v. DePuy Orthopaedics, Inc.* ("*Drake* II"), 757 F. App'x 449, 451 (6th

Cir. 2018). The Drakes joined this settlement shortly thereafter. *Id.* They settled a portion of their

suit against DePuy for $561,750, and an Extraordinary Injury Fund claim is still possibly

outstanding. *Id.* at 452 n.7.

As early as June 30, 2014, the Drakes' current counsel proposed to resolve the dispute over

Johnson's contingent fee claim according to the arbitration procedures provided in the MSA.

Johnson refused. Instead, on July 13, 2014, he initiated an arbitration with JAMS, a private

alternative dispute resolution provider, in Dallas pursuant to the ARA ("Dallas arbitration"), and

the next day filed a suit to compel arbitration in the Northern District of Texas. The federal suit

was dismissed for lack of personal jurisdiction on November 25, 2014. In early 2016, the Drakes

initiated an arbitration pursuant to the terms of the MDL MSA with Special Master Cathy Yanni.

Special Master Yanni was a member of JAMS, like the Dallas arbitrator, and dismissed the matter

upon being informed of the ongoing JAMS proceeding on March 9, 2016.[4] Shortly thereafter,

---

[4] Johnson argues that implicit in Special Master Yanni's dismissal is a binding determination that
that his claims do not come within the scope of the MSA. However, Special Master Yanni's order
makes no reference to the MSA, and instead appears to base the jurisdictional determination
entirely on the fact that another JAMS arbitration, the Dallas arbitration, was already proceeding.
*See Drake* II, 757 F. App'x at 452.

Johnson dismissed another suit to compel arbitration that he had filed in the Northern District of Texas.

On June 22, 2016, the Dallas arbitrator found in favor of Johnson and awarded him a net 35% contingency fee from the Drakes' DePuy settlement awards in the amount of $196,612.50, 35% of any future recovery, a lien on recovered claims, attorney fees in the amount of $136,457, and arbitration costs in the amount of $20,145.47. The same day, the Drakes filed a motion in the Northern District of Ohio to enforce the MSA and vacate the award. On July 7, 2016, Johnson filed another suit in the Northern District of Texas, this time to confirm the arbitration award. On December 20, 2017, the district court for the Northern District of Texas transferred Johnson's latest case to the Northern District of Ohio for possible consolidation with the Drakes' pending suit.

Just the day prior, on December 19, 2017, the district court had granted the Drakes' motion to enforce the MSA and had declined to address their motion to vacate the arbitration award. *Drake I*, 2017 WL 6502489, at *9. Johnson appealed that decision, but we found we lacked jurisdiction because there was no final order under 28 U.S.C. § 1291 or an interlocutory order appealable under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 16(a)(1)(E). *Drake II*, 757 F. App'x at 452–53. We directed the district court to consider Johnson's application to confirm the arbitration award and the Drakes' motion to vacate the same. *Id.* at 453–54.

In a December 30, 2019 memorandum opinion and order the district court denied Johnson's motion to confirm the Dallas arbitration award, granted the Drakes' motion to vacate the same, and directed the parties to pursue arbitration pursuant to the MSA. *Drake v. DePuy Orthopaedics, Inc.* ("*Drake III*"), Case No. 1:13-dp-20140-JJH, 2019 WL 4750608, at *4 (N.D. Ohio Sept. 30, 2019). Johnson timely appealed.

## II.    Discussion

This Court reviews findings of fact for clear error and questions of law de novo in appeals of district court decisions either vacating or confirming an arbitrator's award under the FAA. *Samaan v. Gen. Dynamics Land Sys., Inc.*, 835 F.3d 593, 599 (6th Cir. 2016). A district court must issue an order confirming an arbitrator's award "unless the award is vacated, modified, or corrected as prescribed in [9 U.S.C. §§] 10 and 11 . . . ." 9 U.S.C. § 9. Section 10 provides the exclusive grounds for vacatur under the FAA. *See Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584 (2008). As the majority recognizes, the Drakes have abandoned their argument for vacatur on the basis of partiality under § 10(a)(2). Since there is no allegation of fraud, § 10(a)(1), or arbitrator misconduct, § 10(a)(3), the award in this case may be vacated only if "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4).

As the Supreme Court has recognized, "the first principle that underscores all of our arbitration decisions [is that a]rbitration is strictly a matter of consent, and thus is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration." *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 299 (2010) (internal quotation marks and citations omitted). As the majority correctly recognizes, neither the Drakes nor Johnson were signatories to the MSA itself—it was an agreement between DePuy and a committee of plaintiffs' attorneys of which Johnson was not a member.[5] However, the MSA also provides that certain other parties may agree to submit disputes to arbitration as delineated in that agreement. The relevant provision provides:

> Each Party [i.e., DePuy and plaintiffs' counsel committee] and, by submitting an Enrollment Form and Release, each Enrolling U.S. Program Claimant and

---

[5] Johnson had applied to the district court for an appointment to the committee.

> Enrolling Counsel, agrees that authority over the process contemplated by the U.S. Program, including any Claims submitted under the U.S. Program, resides with those Persons appointed pursuant to this Agreement to exercise that authority, as such authority is specified in this Agreement and that the Claims Administrator, Claims Processor and Special Masters in making the determinations with respect to claims submitted to the U.S. Program do so with the authority of Arbitrators under the Federal Arbitration Act and their decision, except as subject to review under the Agreement, are final, binding, and Non-Appealable.

(MSA § 14.1.1)

Both the Drakes and Johnson qualify under this section and are therefore required to submit qualifying disputes to the arbitrators designated under the terms of the MSA. Evidence in the record shows that the Drakes submitted a release of claims and enrolled in the U.S. Program (i.e., the settlement). Accordingly, they qualify as "Enrolled U.S. Program Claimants," as defined by MSA § 1.2.25.2. Similarly, Johnson is an "Enrolling Counsel" under the MSA since that term is defined as "the Primary Law Firm or other Counsel who files an Enrollment Form on behalf of any" claimant. (MSA § 1.2.26)[6] The district court found "[t]he fact that Johnson no longer represented the Drakes at the time they entered into the 2013 Settlement Agreement does not alter the conclusion that Johnson's claim for his alleged lien is governed by the terms of that and subsequent Settlement Agreements. Johnson represents numerous plaintiffs who settled their claims pursuant to one or more of the ASR Settlement Agreements." *Drake* III, 2019 WL 4750608, at *4. Under the terms of the MSA, it is irrelevant that Johnson did not enroll the Drakes in particular. Therefore, Section 14.1 of the MSA establishes that Johnson and the Drakes both agreed "that authority over the process contemplated by the U.S. Program, including any Claims submitted under the U.S. Program, resides with those Persons appointed pursuant to this

---

[6] "Counsel" is defined as "with respect to any particular Person, a lawyer and/or law firm who represents such Person pursuant to a written agreement, or who has an Interest in such Person's Claim Connected with ASR Hip Implants." (MSA § 1.2.19)

Agreement to exercise that authority, as such authority is specified in this Agreement . . . ." (MSA

§ 14.1.1)

The majority concludes that both the Drakes and Johnson agreed to arbitrate disputes

related to the ASR settlement under the terms of the MSA, but only disputes regarding certain

ASR hip claims. Specifically, the majority holds that while Johnson agreed to arbitrate disputes

relating to claimants he enrolled in the settlement program, by enrolling those clients he did not

thereby agree to arbitrate his contingent fee dispute with the Drakes, whom he did not enroll in the

settlement or represent subsequent to the approval of the MSA.

That conclusion is irreconcilable with the terms of the agreement. As the majority

recognizes, the MSA provides for the arbitration of "any dispute that arises under or otherwise in

connection with . . . any U.S. Program claim." (MSA § 14.1.2) Johnson's claim for 35% of the

Drakes' settlement clearly qualifies under that expansive language. The Drakes as "Enrolling U.S.

Program Claimants" and Johnson as "Enrolling Counsel" "agree[d] that authority over the process

contemplated by the U.S. Program . . . . resides with those Persons appointed pursuant" to the

MSA "as such authority is specified in" the MSA. (MSA § 14.1.1) That authority over "any dispute

that arises under or otherwise in connection with . . . any U.S. Program Claim" encompasses the

power to arbitrate the instant dispute. (MSA § 14.1.2) There is nothing in the text of the MSA to

support the majority's interpretation that enrollment in the settlement program operates as consent

to arbitrate only certain disputes relating to certain settlement claims.

A Texas Court of Appeals decision concerning a fee dispute between an attorney and his

former law firm, *Branch Law Firm L.L.P. v. Osborn*, 532 S.W.3d 1, 13–18 (Tex. App. 2016),

discussed by the majority is consistent with this analysis. In that case, the court determined the

attorney was required to arbitrate according to a master settlement agreement to which he was not

a signatory because he was a "Participating Law Firm," as defined under the applicable agreement. *Id.* at 17–18. The majority incorrectly states that the court's holding depended upon agency principles. While his former law firm made agency-based arguments, the court concluded that the attorney was bound by the agreement to arbitrate because the master settlement agreement's "definition of a Participating Law Firm encompasse[d]" him. *Id.* at 18. Just like the attorney there, Johnson meets the relevant agreement's applicable definition for counsel bound to arbitrate disputes.

Accordingly, there are two contracts that cover Johnson's contingent fee claim: the ARA between the Drakes and Johnson, and the MSA. "In the context of multiple contracts, this court has adopted a more narrow test of arbitrability, examining which agreement, 'determines the scope of' the contested obligations." *Nestle Waters N. Am., Inc. v. Bollman*, 505 F.3d 498, 504 (6th Cir. 2007). The majority did not evaluate this case under *Nestle Waters* because it found there was only one relevant contract, the ARA. Nevertheless, the analysis that it does undertake supports the conclusion that the scope of Johnson's claim is determined by the MSA and therefore must be arbitrated according to its terms. The majority notes "to the extent that Johnson's contingent fee claim may have derived indirect benefits from the MSA, the MSA provided a 'holdback' of 5% of attorney's fees from the settlement award for the common benefit fund." *Ante* at 13 (citing MSA § 4.1.8). This so-called holdback was adopted by the Dallas arbitrator, who, despite recognizing that under the ARA the Drakes agreed to pay a contingent fee of 40%, only awarded Johnson a "net" 35% fee because "the MDL judge assessed a 'common benefit' fee applicable to all claimant attorney fee awards." (Corrected Final Award, R. 10-3, Page ID #260.)

As the district court stated, "[p]ermitting a party to any contract—to say nothing of one governing an area as broad and complex as the area this MDL addresses—to choose which

provisions of that agreement it will abide by, and which it won't, simply is untenable." *Drake* III, 2019 WL 4750608, at *4; *see also Stratton v. Portfolio Recovery Assocs., LLC*, 706 F. App'x 840, 846 (6th Cir. 2017) (recognizing that a party "cannot pick and choose which provisions of [a] contract are enforceable" (citation omitted)). Johnson himself stipulated to the 5% common benefit fee required by the MSA in the Dallas arbitration. This means that the scope of the Drakes' "contested obligations" according to the majority, the Dallas arbitrator, and Johnson himself was determined by the MSA. Accordingly, arbitration of Johnson's contingent fee claim must follow the procedures provided in that agreement under *Nestle Waters*.

There is no suggestion that the Dallas arbitration proceeded according to the terms required by the MSA. The MSA designated three special masters "to oversee the administration of claims for benefits and to make final and binding determinations under this Agreement with the authority of an Arbitrator under the Federal Arbitration Act." (MSA § 12.4.2) None of those so designated were the Dallas arbitrator. "When an arbitrator reaches a question not committed to him by the parties, he acts outside of his authority such that an order vacating such an award is appropriate." *Totes Isotoner Corp. v. Int'l Chem. Workers Union Council/UFCW Local 664C*, 532 F.3d 405, 415 (6th Cir. 2008) (citations omitted); *see also* 9 U.S.C. § 5 ("If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed . . . .").

The district court's refusal to confirm the Dallas arbitration, decision to vacate the same, and order to the parties to adhere to the arbitration procedures set forth in the MSA were correct. Given that Johnson consented to abide by the arbitration provisions in the MSA through his representation of settling DePuy Orthopaedics claimants, I need not address the majority's analysis

relating to direct benefits estoppel or the inherent authority of the district court to manage an MDL

before concluding that the district court's orders should be affirmed.

### III.    Conclusion

Because Johnson consented to the arbitration procedures outlined in the  MSA for disputes

relating to the ASR hip MDL settlement, I would affirm the orders of the district court refusing to

confirm the Dallas arbitration award, vacating the same, and directing the parties to proceed with

arbitration pursuant to the MSA. Accordingly, I respectfully dissent.